## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## COOKEVILLE DIVISION

PATRICIA ELLEN BOWEN,     )
                                   )
       **Plaintiff,**           )
                                   )     **Civil Action No. 2:12-cv-0022**
   **v.**                         )     **Judge Nixon / Knowles**
                                   )
CAROLYN W. COLVIN,         )
**Acting Commissioner of Social Security,[1]**  )
                                   )
       **Defendant.**         )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 9. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 11.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.  INTRODUCTION

Plaintiff protectively filed her application for Disability Insurance Benefits ("DIB") on

April 21, 2009, alleging that she had been disabled since May 10, 2005, due to venous stasis,

depression, "overweight," "extremely swollen" feet and ankles, and "underactive thyroid."  *See,*

*e.g.,* Docket No. 5, Attachment ("TR"), pp. 97, 113.  Plaintiff's application was denied both

initially (TR 49) and upon reconsideration (TR 50).  Plaintiff subsequently requested (TR 59)

and received (TR 96) a hearing.  Plaintiff's hearing was conducted on July 15, 2010, by

Administrative Law Judge ("ALJ") Frank Letchworth.  TR 29.  Plaintiff and vocational expert

("VE"), Katharine Bradford, appeared and testified.  *Id.*

On August 26, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR

21.  Specifically, the ALJ made the following findings of fact:

> 1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.
>
> 2.  Through December 31, 2007, the claimant engaged in substantial gainful activity during 2005 (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> 3.  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity up until her date last insured, December 31, 2007.
>
> 4.  Through the date last insured, the claimant had the following severe impairments: Chronic Venous Insufficiency; Morbid Obesity (20 CFR 404.1520(c)).
>
> 5.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

The State Agency psychologist found there was insufficient evidence to establish any severe mental impairment under 20 CFR 404.1521. In activities of daily living, the claimant had no restriction. In social functioning, the claimant had no difficulties. With regard to concentration, persistence or pace, the claimant had no difficulties. As for episodes of decompensation, the claimant had no episodes of decompensation, each of extended duration. Because the claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. The undersigned has also considered whether the "paragraph C" criteria were satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

6.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b).

7.  Through the date last insured, the claimant was capable of performing past relevant work as a retail clerk. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8.  The claimant was not under a disability, as defined in the Social Security Act, at any time from May 10, 2005, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1529(f)).

TR 14-21.

On October 26, 2010, Plaintiff timely filed a request for review of the hearing decision.

TR 8. On January 27, 2012, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record.   Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different

conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

particularized proof of the claimant's individual vocational qualifications to perform specific

jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*,

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages

four and five above, the Commissioner is required to consider the combined effect of all the

claimant's impairments; mental and physical, exertional and nonexertional, severe and

nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ: (1) improperly rejected the opinions of her treating

physician, Dr. Denise Dingle,[3] (2) erred in finding that Plaintiff's subjective complaints

regarding the limiting effects of her conditions were not credible, and (3) erred in finding that

Plaintiff could perform the full range of light work.  Docket No. 10.  Accordingly, Plaintiff

maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed,

or in the alternative, remanded.  *Id*.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

---

[3] In passing, Plaintiff also contends that the ALJ erroneously failed to consider the 2009
opinion of Dr. Catherine Dale, who "had similar findings" to the 2007 findings of Dr. Wilcox.
*See* Docket No. 10 at 18.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Weight Accorded to Plaintiff's Treating Physician

Plaintiff argues that the ALJ should have accorded greater weight to the opinion of her treating physician, Dr. Dingle. Docket No. 10. Specifically, Plaintiff contends that the ALJ should have adopted Dr. Dingle's 2009 opinion because, Dr. Dingle, as the treating physician, "is generally more familiar with the patient's condition than are other physicians." *Id.* at 17. Plaintiff argues that given Dr. Dingle's familiarity with Plaintiff's ailments, the ALJ should not have rejected her opinion.[4] *Id.*

Defendant responds that the ALJ appropriately rejected Dr. Dingle's opinion and explained why he did not find her opinion to be credible. Docket No. 11. Defendant submits that the ALJ correctly determined that Dr. Dingle's retroactive assessment of Plaintiff rendered

---

[4] In this statement of error, Plaintiff also essentially argues that the ALJ's refusal to consider a 2009 opinion from Dr. Catherine Dale was erroneous, because Dr. Dale rendered "similar findings" to those rendered by Dr. Wilcox in 2007, prior to Plaintiff's December 31, 2007 date last insured. Docket No. 10. Although Plaintiff mentions this claim in her first statement of error, she discusses this claim in detail in her second statement of error. *Id.* Accordingly, the undersigned will do the same, and analyze this claim as part of Plaintiff's second statement of error.

twenty months after Plaintiff's date last insured was "vague, unreliable, and inconsistent with her treatment notes." *Id.* at 8.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion . . .
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . .
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> . . .

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[5] *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight. SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Commissioner*, 276 F.3d 235, 240 (6th Cir. 2002)(*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical

---

[5] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record. *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

> source who provides you or has provided you, with medical
> treatment or evaluation and who has, or has had, an ongoing
> treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Dingle treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's according greater weight to her opinion than to other opinions, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. *See* TR 219-256. As will be discussed in greater detail below, however, Dr. Dingle's 2009 opinion was rendered retroactively, unsupported by the evidence of record, and contradicted by evidence in the record. *See* TR 19-20. As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with, or unsupported by, other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

The ALJ in the case at bar accorded the opinions expressed in Dr. Dingle's September 15, 2009 Medical Source Statement "little weight" for the following reasons:

> First, the undersigned notes Dr. Dingle dated the form September 15, 2009. Dr. Dingle has attempted to assess retroactively the claimant's condition so that the claimant would be found to disabled [*sic*] before the expiration of the claimant's date last insured. While her sympathy for the claimant is patent, her opinions are vague, unreliable, and inconsistent with her treatment notes. For example, she states that the claimant's obesity caused "significant disfunction (sic) of her back and legs which limit her

11

ability to lift and carry." In parentheses she stated: "(did occur before Nov 2007)." It is unclear **when** the claimant's ability to lift became limited and **what the limits were on a particular date**. For example, the undersigned is unable to determine whether the claimant was able to lift more than 10 pounds in June 2005, October 2006, or November 2007. This is particularly important due to the regulatory requirement that impairments and limitations exist for a continuous period of more than twelve months. This type of specificity is particularly salient in this case because as Dr. Dingle notes, she first treated the claimant in March 2000 and "noted she had evidence of venous stasis with acute exacerbation due to standing and walking all day at work." However, the claimant continued to work for five (5) years after March of 2000 thereby proving her condition was not disabling at that time even though Dr. Dingle's statement implies she was disabled in March 2000.

Another reason Dr. Dingle's opinions are not persuasive is that her treatment notes do not support her opinions. Her treatment notes document the claimant's conditions were stable and the main treatment the claimant received was for her menopausal symptoms. (Exhibit 4F). In fact in July 2005, Dr. Dingle expressly noted there was no pitting edema and that the swelling in the claimant's feet was secondary to something other than edema. (Exhibit 4F at p. 21). Dr. Dingle's treatment notes also document the claimant's condition was stable in November 2005. (Exhibit 4F at p. 17). Although the claimant's venous stasis was noted, the only treatments prescribed were diuretics and weight loss. The claimant was not compliant with Dr. Dingle's recommendation to lose weight. Thereafter, there is no mention of venous stasis or swelling until July 2006 when the claimant reported swelling even though she had lost weight. (Exhibit 4F at p. 16). Thereafter there was no complaint of leg swelling until May 2007. (Id. at p. 14). In July she noted erythema or redness in the claimant's legs; in August 2007, Dr. Dingle noted there was no edema; and in November 2007 she referred the claimant to Dr. Wilcox for evaluation of "large lower leg secondary to venous stasis". (Id. at p. 13). Of course, as noted above, the claimant refused to comply with Dr. Wilcox's recommendations. Of note, the **claimant never had skin breakdown, ulcers, deep vein thrombosis or pitting edema.**

Third, it is difficult for the undersigned to believe that Dr. Dingle has a distinct memory of the claimant's condition (apart from her

treatment notes) in 2005, 2006, and 2007 such that she was able to retroactively assess the claimant's condition without her memory being colored and influenced by the claimant's subsequent treatment and condition.

TR 19 (emphasis original).

Ultimately, regarding Dr. Dingle's opinion, the ALJ stated:

The undersigned concludes for the above stated reasons, that Dr. Dingle's assessment is incredibly over-restrictive, and thus internally inconsistent. Her conclusions are, at best, tenuous, patently sympathetic to the claimant's subjective complaints, and unsupported by the objective findings. Accordingly, the undersigned does not accept Dr. Dingle's conclusions . . . .

TR 19-20.

As evidenced above, the ALJ clearly explained his rationale for finding that the opinions expressed in Dr. Dingle's September 15, 2009 Medical Source Statement should be accorded "little weight." The ALJ considered the evidence of record, reached a reasoned decision regarding the weight to be accorded to Dr. Dingle's opinion, and articulated the rationale for that decision. The Regulations do not require more. Additionally, the ALJ's decision to accord Dr. Dingle's opinion "little weight" was properly supported by substantial evidence. Plaintiff's argument that the ALJ should have accorded greater weight to the opinion of Dr. Dingle fails.

**2.  Subjective Complaints of Pain**

Plaintiff contends that the ALJ erred in finding that her subjective complaints concerning the intensity, persistence, and limiting effects of her symptoms and pain were not fully credible. Docket No. 10. Specifically, Plaintiff argues that the ALJ did not consider the record as a whole, because he did not consider 2009 reports from Dr. Catherine Dale and Dr. John Turnbull. *Id.* Plaintiff suggests that even though her self-reported list of daily activities contradicts her

statements about the extent of her disability, the fact that subsequent assessments indicated that she had Lymphedema and arthritis "so severe that knee replacement was recommended" could support a conclusion that Plaintiff's earlier statements about the extent of her disability had been credible. *Id.*

Defendant responds that the ALJ "addressed Plaintiff's credibility in great detail" and properly discussed the contradictory evidence upon which he based his determination that her subjective complaints regarding the extent of her disability were not fully credible. Docket No. 11. Defendant further contends that, because the 2009 reports from Drs. Dale and Turnbull were dated almost two years after Plaintiff's date last insured, and because the ALJ had properly considered the medical evidence from the relevant time period, the ALJ was not bound to consider these 2009 reports. *Id*.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations of pain and disabling symptoms:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the

reasons must be supported by the record (*see King*, 742 F.2d at 975).

Regarding Plaintiff's credibility, the ALJ explained:

> The claimant's credibility has been undermined by inconsistent statements relevant to the issue of disability. For example, at the hearing, the claimant testified that she quit working due to her medical condition. However, in her Disability Report she stated that she stopped working "because of my medical condition ***and other reasons***". (Exhibit 1E at p. 2). Further, she indicated that she had been spending 16 hour days running (with her husband) the pool/pool supply business. One can reasonably question whether, although she was incapable of working extra hours on a regular basis, she remained capable of working 40 hours per week in a less demanding job. The claimant also testified that she thought she her [*sic*] legs would get better and she would find a job, but neither of those things happened. The undersigned views this as an implicit admission that the claimant was able to work, but just unable to find a job after closing her business. (Exhibit 1E).

> Similarly she reported she saw Dr. Dingle for treatment and Dr. Dingle had prescribed a water pill and compression stockings that the claimant had made. (Exhibit 1E). However, Dr. Wilcox's[6] treatment notes document the claimant *refused to even attempt* wearing compression stockings. (Exhibit 13F). The failure to follow such simple advice is not the typical behavior of people with totally disabling conditions.

> The claimant has described ***daily activities*** which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant's activities of daily living include taking care of her personal needs; helping her husband with his medication; light cleaning; laundry; doing dishes; ironing; making the beds; cooking dinner four times a week; and shopping for groceries, pet food, toiletries, and household goods once a week for two hours at a time. (Exhibit 5E). In addition, she watches television, listens to the radio, pays bills, and drives. She socializes with her girlfriends. They go to the movies, or to play cards. She leaves the house every other day. She regularly goes to

---

[6] Dr. A. Brian Wilcox, Jr., M.D. is a vascular surgeon who treated Plaintiff in December of 2007. TR 327.

16

the post office, drug store, bank, and to the nursing home to see her mother. She estimated in the Function Report that she completed that she could lift 20 pounds and walk for 15 minutes, or one third of a mile, before needing to rest for five minutes before resuming her walk. She stated she used a treadmill for fifteen minutes every day. She stated that she could pay attention for an hour at a time, was "fine" following oral and written instructions; got along "fine" with authority figures; stressful events kept her awake at night; and she was okay with handling changes in routine. (Exhibit 5E). ***Such activities are clearly not the activities of an individual with <u>totally</u> disabling physical and/or mental conditions.***

TR 17-18 (emphasis original)(footnote added).

The ALJ additionally discounted the credibility of Plaintiff's subjective complaints as follows:

> In terms of the claimant's venous insufficiency, it is well established that in order to receive benefits, the claimant must follow treatment prescribed by her doctor if this treatment can restore her ability to work. Upon failure to follow the prescribed treatment, benefit payments may be stopped, or in this case taken into consideration in not awarding benefits. (20 CFR 404.1530(b) and 20 CFR 416.930(b). In this case, the undersigned has taken into consideration the claimant's refusal to even attempt to follow her vascular surgeon's advice. If the claimant were as truly disabled as she claims, she would at least attempt to comply with this minimally demanding advice. However, she refused to make even the slightest attempt at compliance. (Exhibit 13F). The obvious inference is that she is not as disabled as she claims.
>
> This inference is also supported by the fact the [*sic*] intermittent treatment the claimant received due to her own actions. For example she saw Dr. Dingle on October 20, 2006 and was told to return in three months. However, in February 2007, the claimant cancelled her February 20, 2007 appointment and did not see Dr. Dingle again until March 28, 2007, an interval of five months without treatment. (Exhibit 4F at p. 15). The claimant also cancelled her appointments with Dr. Dingle on September 25, 2007 and October 19, 2007. (Exhibit 4F at p. 13). Again, this is not the typical behavior of persons with totally disabling impairments.

In terms of the claimant's alleged depression, the claimant has never received treatment from a mental health professional. Instead, she has been treated by her primary care physician, Dr. Dingle, who has never referred her to a specialist for treatment. This suggests that any depression is mild and adequately treated by her medication. Further supporting this conclusion is the fact that the claimant has never required psychiatric or inpatient care and takes very low doses of medication. (Exhibit 4F at p. 21). She was first prescribed Lexapro and Xanax in May 2005. At her next visit in July 2005 she reported the Lexapro was "helping lots". In September 2005 the claimant stated she was still depressed but better than last year. (Exhibit 4F at p. 22). By November 2005 Dr. Dingle noted her condition was stable. (Exhibit 4F at p. 17). At her regular three month appointment in January 2006 the claimant reported she was doing well. She denied symptoms of major depressive disorder in April 2006; in July 2006, and October 2006 there was no mention of depression. At her next appointment, in March 2007 Dr. Dingle noted minimal symptoms of major depressive disorder. (Exhibit 4F at p. 15, 16, 17). Similarly, at her appointment with Dr. Dingle on July 25, 2007, the claimant denied any symptoms of major depressive disorder. (Exhibit 4F at p. 13). There was no mention of depressive symptoms at her appointments on October 26, 2006, June 26, 2007, August 24, 2007 either. (Exhibit 4F at p. 13, 14, 15). At her last appointment before the expiration of her date last insured on November 13, 2007, Dr. Dingle noted the claimant was "cheerful" and had good affect. (Exhibit 4F at p. 12).

In terms of her hypertension, Dr. Dingle's treatment notes document her blood pressure was adequately controlled by medication. (Exhibit 4F at p. 12, 13, 14, 15, 16, 17).

TR 18-19.

As can be seen, the ALJ's discussed rationale for finding Plaintiff's subjective complaints to be less than fully credible is extensive, detailed, and well-supported by the evidence of record. The ALJ observed Plaintiff during her hearing, considered the objective and testimonial evidence of record, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's

allegations was proper. Therefore, this claim fails.

As noted, Plaintiff also argues that the ALJ should have considered the 2009 opinions of Drs. Catherine Dale and John Turnbull because, although those opinions were rendered nearly two years after Plaintiff's date last insured, they lend credence to the subjective complaints she raised during her insured period. Docket No. 10. Specifically, Plaintiff contends that the ALJ's refusal to consider a November 17, 2009 opinion from Dr. Dale[7] was erroneous, because Dr. Dale rendered "similar findings" to those rendered by Dr. Wilcox in 2007 and because Dr. Dale's findings related to complaints that Plaintiff had been raising to Dr. Dingle since 2000. *Id.* With regard to the ALJ's refusal to consider the August 27, 2009 opinion of Dr. Turnball, Plaintiff contends that Dr. Turnball's finding of arthritis severe enough to warrant recommending a knee replacement demonstrates that Plaintiff must have had severe arthritis during the relevant time period, because "the development of arthritis in [her] knees could not have advanced that much in less than two years." *Id.* at 21.

Defendant argues that, because the ALJ addressed in detail the evidence relevant to the period before Plaintiff's date last insured, the ALJ was not required to discuss Dr. Dale's opinion rendered almost two years after Plaintiff's date last insured "simply because Dr. Dale referenced

---

[7] As a point of clarification, with regard to the ALJ's alleged "refusal" to consider the 2009 opinions of Drs. Dale and Turnball, the undersigned notes that the ALJ actually stated:

> It should be noted initially that the claimant's ***date last insured is December 31, 2007***. Therefore, this opinion does not address impairments or medical evidence after December 31, 2007.

TR 16 (emphasis original). Accordingly, the ALJ did not "refuse" to consider these two opinions specifically, but rather, simply declined to address any impairments or evidence from after the relevant date last insured.

Plaintiff's complaints to Dr. Dingle." Docket No. 11 at 10. With respect to Plaintiff's

contention that Dr. Turnball's 2009 recommendation for a knee replacement demonstrates that

Plaintiff must have had severe arthritis during the relevant time period, Defendant responds,

"such speculation on Plaintiff's part is hardly sufficient to undermine the ALJ's detailed analysis

of the contemporaneous medical evidence contained in the reports of treating physician Dr.

Dingle." *Id*. fn 5 at 10-11.

As an initial matter, Plaintiff did not see Dr. Turnball or Dr. Dale until 2009, almost two

years after her date last insured. *See* TR 283-84, 294. Evidence related to events after a

claimant's date last insured need only be considered to the extent that it is relevant to Plaintiff's

condition before her date last insured. *Higgs v. Bowen*, 880 F.2d 860, 863 (1988).

Dr. Turnball evaluated Plaintiff on August 27, 2009 for complaints of "bilateral knee

pain." TR 294. Upon examination, Dr. Turnball noted that Plaintiff had full extension of her

knees to 110 degrees of flexion limited by soft tissues. *Id.* He also noted that Plaintiff reported

pain with palpation over the medial joint lines bilaterally, but that "[t]here is no instability of

either knee." *Id.* Dr. Turnball ordered standing bilateral x-rays of Plaintiff's knees, which

revealed "severe arthritic changes in the medial compartments of both knees, right

radiographically worse than left," and "patellofemoral arthrosis." *Id.* With regard to Plaintiff's

treatment plan, Dr. Turnball noted:

> I recommend since she has not tired [*sic*] any significant
> conservative measures to this point that she concentrate on
> strengthening her legs. We taught her some exercises today. I also
> had a long discussion with her about weight loss. Also
> recommended injections. I injected both knees under sterile
> conditions without complication. She will follow up with us in
> about 6 weeks to see how she has done.

*Id.*

As can be seen, Dr. Turnball's August 27, 2009 in no way references severe arthritis warranting a knee replacement.  In fact, noting that Plaintiff had not even tried any conservative treatment measures to that point, Dr. Turnball recommended conservative measures such as exercise, weight loss, and injections.  Dr. Turnball's findings neither support Plaintiff's subjective claim that her impairments are of disabling severity, nor bolster her credibility.  The ALJ's refusal to consider this post-date last insured record is not reversible error; Plaintiff's contention fails.

With respect to Plaintiff's contentions regarding the 2009 assessment from Dr. Dale, Dr. Dale evaluated Plaintiff as "a consultation requested by [blank space] for legs," on November 17, 2009, nearly two years after Plaintiff's date of last insured.  TR 283-84.  After discussing Plaintiff's reported medical, familial, and social history, including complaints that Plaintiff had experienced lower extremity swelling since age 16, which had progressively worsened over 40 years, Dr. Dale performed her examination of Plaintiff.  *Id.*  In her "Review of Systems," Dr. Dale noted, *inter alia*, that: (1) Plaintiff's skin was negative for a change in size or color, negative for a rash, and negative for any bruising; (2) Plaintiff's ankles were swollen, but she did not experience pain in her calf or hip when walking; and (3) Plaintiff did not have any deformities of her bones or joints, and did not have any limitation of movement, but did have arthritis and numbness in her extremities.  TR 283.  Dr. Dale also noted that Plaintiff's skin had no visible rash, no suspicious nevi or skin lesions or subcutaneous nodules; that Plaintiff's extremities had no clubbing, cyanosis, edema, ulceration, or gangrene; and that Plaintiff's gait was symmetric and unlabored.  TR 284.  Dr. Dale reviewed a lower extremity venous ultrasound

performed in September 2008 and reported that the ultrasound revealed no evidence of deep vein thrombosis and no evidence of significant sophenaus venous reflux in Plaintiff's bilateral lower extremities.  *Id.*  Dr. Dale assessed Plaintiff with Lymphedema, and prescribed Plaintiff compression hose, to be re-fitted every three to six months.  *Id.*  Dr. Dale noted that there was no medical or surgical treatment for Lymphedema, but there were measures to provide symptom relief.  *Id.*  In order to obtain "symptomatic improvement," she recommended that Plaintiff "constant[ly]" wear compression hose "every" day.  *Id.*

As noted, Plaintiff was referred to Dr. Dale for evaluation of her legs.  As can be seen, however, Dr. Dale's examination of Plaintiff yielded predominately normal results.  While Dr. Dale diagnosed Plaintiff with Lymphedema,[8] she noted, *inter alia*, that Plaintiff's extremities had no clubbing, cyanosis, edema, ulceration, or gangrene, and that Plaintiff's gait was symmetric and unlabored; she prescribed compression hose.  The ALJ was aware of Plaintiff's claimed ailments, and, as has been demonstrated in the quoted passages *supra*, discussed them at length in his decision.  Dr. Dale's findings do not bolster Plaintiff's credibility, nor do they demonstrate either that Plaintiff was disabled under the Act, or that Plaintiff's impairments had worsened to disabling levels.  The Regulations do not require the ALJ to discuss an opinion rendered nearly two years after the date last insured simply because it references earlier complaints, when that opinion lacks evidence of disability and the ALJ has appropriately discussed the complaints at length. Plaintiff's argument that the ALJ committed reversible error by not considering Dr. Dale's November 17, 2009 opinion fails.

---

[8] Lymphedema is edema of the extremities due to a disorder of the lymphatic circulation. *See* 20 CFR Pt. 404, Subpt. P, Appt. 1, §§ 4.00 and 4.11.

### 3. Residual Functional Capacity

Plaintiff argues that the ALJ erred in finding that she could perform the full range of light work as defined in 20 CFR. 404.1567(b). Docket No. 10. Specifically, Plaintiff claims that she could only walk for fifteen minutes, and that performing the full range of light work would require more extensive walking than she could do. *Id.* Plaintiff additionally contends that, even if she could lift twenty pounds as she reported, she would be unable to walk or stand or use leg controls because of her lymphedema, since "standing or walking for long periods of time is one of the very worst things that a person with lymphedema can do." *Id.* Plaintiff also contends that she would need to elevate her legs while sitting. *Id.* Plaintiff asserts that these factors are consistent with the RFC determined by Dr. Dingle, which the ALJ should have accepted. *Id.* Plaintiff further asserts that because the VE testified that Plaintiff had no skills transferable to sedentary work, and Plaintiff should have been restricted to "at most" sedentary work, the ALJ should have found Plaintiff to be disabled. *Id.*

Defendant responds that the ALJ assigned Plaintiff a RFC for light work based on Plaintiff's own report that she could lift twenty pounds. Docket No. 11. Defendant also argues that Plaintiff, in her report, did not assert that she could only walk for fifteen minutes per workday, but rather, that she could walk for fifteen minutes or one-third of a mile at one time before taking a five minute break then continuing. *Id.* Defendant contends that even if Plaintiff's statement that she could only walk for fifteen minutes at one time before taking a break then continuing precluded her from performing the full range of light work, the ALJ's determination would still be appropriate as the ALJ did not find Plaintiff's statements to be credible. *Id.*

"Residual Functional Capacity" is defined as the "maximum degree to which the

individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

Plaintiff's sole point of contention with the ALJ's RFC determination is essentially that her Lymphedema places restrictions upon her that are not consistent with being able to perform a full range of light work, and that these restrictions are supported by the opinion of Dr. Dingle such that they should have been adopted. *See* Docket No. 10. Although Plaintiff, in her Brief, argues that she is able to walk for only fifteen minutes during the course of a workday, in the function report that she personally completed, she wrote that she "can probably lift 20 lbs. and walk 15 minutes." *Id.*, TR 146. In her function report, Plaintiff also stated that she could walk for one-third of a mile before needing to stop and rest for five minutes and then continuing. *Id.* Plaintiff additionally asserts that she would need to elevate her legs while sitting. Docket No. 10. If Plaintiff's statements regarding her Lymphedema-based restrictions and her being limited to walking only one-third of a mile before needing a five minute break were found to be credible, Plaintiff would, in fact, fall short of being able to perform a full range of light work. As discussed above, however, the ALJ properly discounted Plaintiff's subjective complaints, finding

24

them contradictory to, and unsupported by, the evidence of record. Accordingly, the ALJ did not have to accept Plaintiff's asserted limitations.

The ALJ's evaluation of Dr. Dingle's opinion has been discussed in detail above, and will not be repeated here. The ALJ properly considered Dr. Dingle's records and 2009 retroactive opinion, and appropriately accorded that opinion "little weight." As such, the ALJ is not bound to base his RFC determination of Plaintiff on Dr. Dingle's expressed opinion.

After considering the evidence of record and discussing that evidence at length, the ALJ ultimately determined that Plaintiff retained the RFC to perform the full range of light work. TR 16. Specifically, the ALJ determined that Plaintiff could perform her past relevant work as a retail clerk. TR 20. The ALJ's determination that Plaintiff could perform her past relevant work as a retail clerk is supported by the testimony of the VE, who testified at Plaintiff's hearing that Plaintiff had "transferable skills to the light, semi-skilled occupation of sales clerk." TR 46. As explained in greater detail above, the ALJ's decision regarding Plaintiff's ability to work is further supported by her reported activities and by objective testing. The ALJ properly evaluated the objective and testimonial evidence of record when determining Plaintiff's RFC, and the ALJ's RFC determination was supported by substantial evidence. Accordingly, the ALJ's determination must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge